UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| AZEEZ JINADU,<br>    *Plaintiff* | § § § | |
| v. | § | 6:22-CV-00271 |
| JOSHUA DALE WOOD, in his individual<br>   capacity,<br>    *Defendant*. | § § § § § | |

**PLAINTIFF'S COMPLAINT
AND JURY DEMAND**

### Introduction

1. On November 18, 2020, Defendant Joshua Dale Wood arrested Plaintiff Azeez Jinadu for Driving While Intoxicated without a good faith showing of probable cause. Even though Mr. Jinadu exhibited no signs of intoxication and blew two consecutive 0.000 blood alcohol breath test scores, Officer Wood persisted in his DWI arrest of Mr. Jinadu and told him he could just "fight it out in court." For almost a year, Mr. Jinadu was forced to do just that—fight a wrongful criminal accusation in a Bell County court until blood test results later exonerated him. Mr. Jinadu's arrest, one which no reasonable officer would have made, violated the Fourth Amendment of the United States Constitution. Mr. Jinadu brings this lawsuit against Mr. Wood for causing that violation.

### Parties

2. Plaintiff Azeez Jinadu is an individual and a citizen of the State of Texas.

3. Defendant Joshua Dale Wood is an individual and a citizen of the State of Texas. He

may be served with process at his last known address, which is believed to be 932 Benchmark Trail, Belton, Texas 76513. Mr. Wood is sued in his individual capacity. At all times relevant to the incident underlying this lawsuit, Mr. Wood was acting under color of Texas law as an on-duty, uniformed Texas peace officer employed by the City of Harker Heights.

### Jurisdiction & Venue

4. This action is brought pursuant to 42 U.S.C. § 1983. Because this lawsuit arises under the Constitution, laws, or treaties of the United States, this Court has jurisdiction over it pursuant to 28 U.S.C. § 1331.

5. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

### Facts

*Mr. Jinadu is Confronted and Wrongfully Accused at Chipotle*

6. On November 18, 2020, at approximately 8:05 p.m., Mr. Azeez Jinadu was in the bathroom of the Chipotle restaurant in Harker Heights, Texas.

7. Someone knocked aggressively on the bathroom door.

8. Mr. Jinadu washed his hands and came out of the bathroom. He saw City of Harker Heights Police Officers Joshua Dale Wood and Eugene Cuthbert standing nearby. Officer Wood asked Mr. Jinadu if he drove a white Chevy Malibu. Mr. Jinadu said that he drove a white Nissan Altima, not a Chevy Malibu.

9. Nonetheless, Officer Wood then accused Mr. Jinadu of driving recklessly and that he needed to come talk to the Officers outside.

10.  Mr. Jinadu said that he had not been driving recklessly, that he was a DoorDash food

delivery driver, and that he needed to pick up his next delivery order there at the Chipotle.

11. Officer Wood ordered Mr. Jinadu to accompany the officers outside the Chipotle. Mr. Jinadu complied.

12. In front of the restaurant, Officer Wood asked Mr. Jinadu where he had driven from. Mr. Jinadu answered that he had just completed a DoorDash delivery in nearby Killeen, Texas. He even showed Officer Wood the delivery confirmation on his cellphone. Officer Wood then again accused Mr. Jinadu of driving recklessly. Officer Wood said that a caller had reported a car driving recklessly on the roadway that "matched Mr. Jinadu's license plate." Mr. Jinadu again protested that he had not been driving recklessly.

13. Next, Officer Wood asked Mr. Jinadu if he "had anything to drink tonight or anything like that?" Mr. Jinadu said that he had not. Mr. Jinadu does not drink alcohol or use drugs for religious reasons.

14. Throughout his entire interaction with Officer Wood, Mr. Jinadu did not stumble his words. His speech was not slurred. He made eye contact with Officer Wood. Mr. Jinadu had no difficulty maintaining his balance. His eyes were not bloodshot. He was not emitting any odor of alcohol or marijuana from his breath or his person. He was not emitting "cover up" odors from his mouth such as breath sprays, chewing gum, or mints. He had no difficulty engaging in fine motor skills using his fingertips, such as looking up detailed information on his cellphone, handling his wallet, or retrieving his driver's license. His clothing was not soiled or disorderly. And he provided specific and responsive answers to Officer Wood's questions. In summary, Mr. Jinadu, in all respects was cogent and not presenting any signs that he was under the influence of alcohol, controlled substances, drugs, dangerous drugs, or any combination of any of those

substances.

*Officer Wood's "Quick Eye Check" and Wrongful Decision that Mr. Jinadu was Intoxicated*

15. Officer Wood then told Mr. Jinadu that he was going to check Mr. Jinadu's eyes "real quick" and that if Mr. Jinadu was "good to go," then Officer Wood would be "good to go."

16. The National Highway Traffic Safety Administration (NHTSA) has developed Standardized Field Sobriety Tests (SFSTs). One of those tests is called the Horizontal Gaze Nystagmus test (HGN test). Nystagmus is a medical term used to describe the involuntary jerking of a person's eyes. The HGN test is administered by moving a stimulus, such as a pen or an extended finger, back and forth in front of a test subject's eyes.

17. A valid HGN test requires an officer to give standardized instructions to the test subject. Officer Wood failed to properly give those standardized instructions to Mr. Jinadu at this time.

18. An officer is also supposed to ask the test subject preliminary medical questions that may bear on the HGN test's validity. Officer Wood did not ask Mr. Jinadu any preliminary medical questions.

19. If the test subject is wearing a hat, an officer should ask the subject to remove it so that the subject's eyes can be seen more clearly. Mr. Jinadu was wearing a hat. Officer Wood did not ask him to remove it.

20. The HGN test has specific procedures concerning the position of the stimulus and the passes of the stimulus back and forth in front of the eyes. Officer Wood's "quick eye check" can only be described as an abject and total departure from the proper administration of the HGN test as defined by NHTSA.

21. But even if Officer Wood had administered the HGN test correctly, it would not have mattered. Because Mr. Jinadu had no nystagmus in his eyes. He has no medical conditions that could cause nystagmus. He had no alcohol or drugs of any kind in his system. The notion that Mr. Jinadu's eyes could have presented nystagmus to Officer Wood that evening is not plausible.

22. Nonetheless, after a cursory half-pass of the stimulus in front of Mr. Jinadu's eyes, Officer Wood said: "So, what I'm seeing . . . it's called nystagmus. It's an involuntary fluttering of the eyes when you have alcohol in your system. Nothing else mimics it." This statement was doubly false. Mr. Jinadu had no nystagmus in his eyes and numerous medical conditions can cause nystagmus.

23. Under NHSTA standards, there is no such thing as a quick or abbreviated HGN test.

24. Nonetheless, based upon this "quick eye check," Officer Wood—either intentionally or recklessly, yet definitely wrongfully—made up his mind that Mr. Jinadu was intoxicated from alcohol. And when Mr. Jinadu again started explaining that he did not have any alcohol in his system, Officer Wood pointed at him and interrupted him: "Sir! . . . okay, if you want we can do the full SFSTs on you, I'll go get a statement from the caller that says that she's seen you drivin' and I'll take you for DWI!"

25. Mr. Jinadu was stunned with disbelief: "Really?"

26. Officer Wood answered, "Yes sir. I wouldn't be here. It's not a joke. I seen [sic] the nystagmus in your eyes and that's not even with the full test." Officer Wood's own statements show that he knew he had not properly administered the HGN because he acknowledged that he had not performed the full HGN test.

27. Mr. Jinadu continued to protest that there could be no nystagmus in his eyes because

he had not had anything to drink and that he does not ever drink. Officer Wood insisted, "there *is* a nystagmus in your eyes. I'm not lying. I have no reason to lie about it." But there was no nystagmus in Mr. Jinadu's eyes. Officer Woods's reason for saying otherwise is unknown at this time.

28. Mr. Jinadu then told Officer Wood that if he did a breath test it would show that he had "nothing in his system that has alcohol in it. Nothing." Officer Wood then asked Mr. Jinadu to come over by his police car to do the SFSTs. Mr. Jinadu consented, but he told Officer Wood that he felt like he was being harassed.

29. Officer Wood then said: "Well, I'm sorry you feel that way. You're not being harassed. I don't know you from Adam." Then he raised his voice, pointed aggressively at Mr. Jinadu, and said: "You understand me! I have a call. Somebody called and it was about *you*! So how am I harassing you? I have to make sure you are safe to drive. That is my job!"

30. Seeing that Officer Wood was becoming agitated, Mr. Jinadu tried to deescalate the situation and told Officer Wood: "Okay, okay, alright. Okay, I understand. It's okay. I am safe to drive."

31. Officer Wood then told Mr. Jinadu where to stand for the SFSTs.

### *Officer Wood incorrectly administers SFSTs to Support his Wrongful Conclusion*

32. Officer Wood then readministered the HGN test to Mr. Jinadu. Officer Wood again failed to properly instruct and to administer the HGN test per NSHTSA standards. Like the first "quick eye check," Mr. Jinadu exhibited no signs of nystagmus.

33. Next, Officer Wood administered an SFST called the Walk and Turn Test (WAT test). During this test, the subject is asked to take nine heel-to-toe steps down a line, turn, and

take nine heel-to-toe steps back down the line. Officer Wood did not set up Mr. Jinadu in the correct starting position for the test and he did not give Mr. Jinadu all the required instructions necessary for a valid test. Despite this, Mr. Jinadu walked forward perfectly. The only arguable "mistake" he made was that he returned down the line by walking backward with toe-to-heel—a task requiring *more* coordination than required by walking forwards with heel-to-toe.

34. Finally, Officer Wood administered an SFST called the One Leg Stand Test (OLS test). After Officer Wood finished giving instructions on the OLS test, Mr. Jinadu looked over at a person getting into a nearby car and asked, "Can you please record this?" Officer Wood snapped his fingers in front of Mr. Jinadu's face and said, "pay attention!"

35. Like the two other SFSTs, Officer Wood failed to properly administer the OLS test. Nonetheless, Mr. Jinadu successfully completed the test without incident.

36. Based on Mr. Jinadu's performance on the SFSTs, no reasonable officer could have concluded that he was intoxicated.

37. Nonetheless, at the conclusion of the SFSTs, Officer Wood told Mr. Jinadu to "turn around and place your hands behind your back," he then handcuffed Mr. Jinadu and told him that he was being placed under arrest for driving while intoxicated.

38. Officer Wood then told Mr. Jinadu that he would give him a chance to "prove that he was innocent" of DWI. He implied that such chance would come through a breath or blood test at the police station.

39. Officer Wood transported Mr. Jinadu to the City of Killeen Police Department, where there is an Intoxilzyzer breath testing machine used to determine a test subject's blood-alcohol level.

40. Because Officer Wood had told Mr. Jinadu earlier that he could "prove his innocence" through a breath test, Mr. Jinadu consented to the administration of the breath test.

41. Officer Wood administered the breath test twice. Both test results were 0.000—indicating that Mr. Jinadu had no alcohol in his blood.

42. Mr. Jinadu asked if Officer Wood would then release him. Officer Wood said no and told Mr. Jinadu that he could just "fight it out in court."

43. Officer Wood then transported Mr. Jinadu back to Harker Heights and booked him into the Harker Heights city jail. At approximately 12:00 a.m., Officer Wood retrieved Mr. Jinadu from his cell and told him that he was going to take Mr. Jinadu for a blood test. Mr. Jinadu was glad to hear this because: (a) he incorrectly believed that the blood test was a "rapid test" which would provide results in a matter of minutes, and (b) also believed that once Officer Wood saw those test results, he would have to release him.

44. Officer Wood took Mr. Jinadu to the Seton Harker Heights Hospital, where the blood test was administered. Mr. Jinadu later received the medical bill for the administration of that test.

45. After the blood test, Officer Wood took Mr. Jinadu back to his cell at the Harker Heights Jail.

46. Officer Wood suspended Mr. Jinadu's driver's license by issuing him a Form DIC-25. On the Form DIC-25, Officer Wood falsely stated that Mr. Jinadu had provided a specimen of breath or blood and that the analysis of that specimen "showed an alcohol concentration of .08 or greater."

47. At some point thereafter, Officer Wood also prepared an affidavit swearing to the

"facts and circumstances" establishing that there was probable cause to support Mr. Jinadu's arrest for committing the offense of Driving While Intoxicated.

48. The narrative section of the affidavit documenting the "facts and circumstances" supporting probable cause contains exactly eleven sentences.

49. The first and second sentences say: "On 11/18/2020 at 8:03 PM I was dispatched to an impaired driver call in the area of 201 E. Central Texas Expwy. Upon arrival I located the Defendant at the Chipotle Grill." These sentences, for the most part, are true.

50. The third sentence says: "Upon speaking with the Defendant he seemed to stumble over his words, refused to make eye contact, would give general answers to specific questions and had difficulty maintaining his balance." Every factual assertion in this sentence is false.

51. The fourth sentence says: "I asked the Defendant if he would consent to perform Standardized Field Sobriety Tests which I am qualified to administer." The first part of the statement is generally true. The veracity of the second part, concerning Officer Wood's qualification to administer, is unknown.

52. The fifth sentence says: "The Defendant consented which he performed poorly." That Mr. Jinadu consented is true. But the phrase "which he performed poorly": (a) is conclusory, and (b) is false.

53. The sixth and seventh sentences say: "I placed the Defendant under arrest for suspicion of DWI. The Defendant consented to provide a sample of his breath which I collected with the Intoxilyzer 9000 which resulted 0.000 and 0.000." These sentences are true.

54. The remaining four sentences say: "At this time the Defendant was transported to the Harker Heights Police Dept. for Booking and to request a blood draw warrant. Upon Issue [sic] of

a Warrant the Defendant was transported to Seton ER to collect a sample of the Defendant's blood. Upon collection of the blood sample it was placed into evidence for testing. The Defendant was returned to his cell without incident." The sentences are generally true except that it is unknown whether Officer Wood obtained a blood draw warrant or, if it was obtained, whether it was valid.

55. The next morning, at approximately 8:00 a.m., Bell County Magistrate Garland Potvin reviewed Officer Woods's probable cause affidavit. Magistrate Potvin determined that the affidavit established probable cause to believe that Mr. Jinadu had committed the offense of Driving While Intoxicated. However, to the extent the affidavit did facially establish probable cause—and that is debatable—Officer Wood's inclusion of the false statements in the affidavit described above tainted Magistrate Potvin's deliberations as to that issue.

56. Mr. Jinadu was released from jail later that morning. His wife and son picked him up outside the jail. When Mr. Jinadu saw them, he began to sob uncontrollably.

57. He was later formally charged by the Bell County District Attorney's office for Driving While Intoxicated.

58. Mr. Jinadu had to hire an attorney to defend this wrongful charge.

59. At some point while the case was pending, the Bell County District Attorney's office received Mr. Jinadu's blood test results from the evening of his arrest. The test results indicated that Mr. Jinadu: (a) had no alcohol in his blood, (b) had no controlled substances in his blood, (c) had no drugs in his blood, (d) had no dangerous drugs in his blood, (e) had no combination of any of those substances, and (f) had no other substances in his blood that could have impaired the normal use of his mental or physical faculties.

60. The Bell County District Attorney's moved to dismiss the DWI case against Mr. Jinadu on or about September 1, 2021. The Court dismissed the case on the same date.

### Count 1-Unlawful Seizure
42 U.S.C. § 1983

61. Mr. Jinadu realleges all preceding paragraphs as if fully set forth herein.

62. Mr. Jinadu claims that Defendant Joshua Dale Wood, in his individual capacity, violated Mr. Jinadu's right to be free from unreasonable seizure under the Fourth Amendment of the United States Constitution—specifically, the right to not be arrested without a good faith showing of probable cause. Such right is clearly established. *Terwilliger v. Reyna*, 4 F.4th 270, 285 (5th Cir. 2021) (citing *Winfrey v. Rogers* 901 F.3d 483, 494 (5th Cir. 2018).

63. Further, Officer Wood's conduct, under the circumstances, manifested a complete lack of concern for Mr. Jinadu's Fourth Amendment rights because: (a) Mr. Jinadu exhibited no physical or mental signs of intoxication, *see* ¶ 14, (b) Officer Wood decided that Mr. Jinadu was intoxicated from alcohol based only upon his grossly reckless "quick eye check," *see* ¶¶ 15–24, (c) he wrongly told Mr. Jinadu that it was his burden to prove that he was not intoxicated, *see* ¶ 38, (d) even after Mr. Jinadu blew two consecutive 0.000 blood alcohol breath test scores, Officer Wood still did not release him and instead told him that he could "fight it out in court," despite the fact that Officer Wood had earlier told Mr. Jinadu he believed he was intoxicated because of alcohol, *see* ¶¶ 41–42, 22  and (e) Officer Wood included false statements in the affidavit he submitted to Magistrate Potvin. *See* ¶¶ 50, 52, 55.

### Damages

64. As a direct and proximate result of Mr. Wood's acts and omissions outlined above, Mr.

Jinadu has suffered the damages described below.

65. Mr. Jinadu seeks compensatory damages in an amount deemed sufficient by the trier of fact to compensate him for his damages, which includes past and future mental anguish, past and future suffering, past and future damage to his reputation, and past and future lost wages and lost earning capacity.

66. Mr. Jinadu also seeks damages for the costs he incurred in having to post bail and to defend the wrongful criminal case initiated against him. Those costs include money he paid for legal representation and expected future legal costs to pursue expungement of all records related to this wrongful arrest.

67. Mr. Jinadu also seeks punitive damages from Mr. Wood.

68. Mr. Jinadu has retained the services of undersigned counsel and claims an entitlement to an award of reasonable and necessary attorney's fees under 42 U.S.C. §§ 1983 and 1988.

## Jury Demand

69. Mr. Jinadu requests a trial by jury.

## Prayer for Relief

For these reasons, Plaintiff Azeez Jinadu seeks a judgment against Joshua Dale Wood for:

a. compensatory and actual damages in an amount deemed sufficient by the trier of fact;

b. punitive damages;

c. attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988;

d. costs of court;

e. interest allowed by law for prejudgment and post-judgment interest; and

f. all other relief the court deems appropriate.

        Respectfully submitted,

        *[signature]*

---

JEFF DANIEL CLARK
Texas State Bar No. 24109732
The Justice Foundry PLLC
550 Reserve Street, Suite 190
Southlake, Texas 76092
817.953.8699
817.668.0659 (facsimile)
jdc@jdanielclark.com
www.jdanielclark.com
*Counsel for Plaintiff*